| | United States District Court, Northern District of Illinois | | |
|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
| CASE NUMBER | 01 C 2748 | DATE | 9/30/2002 |
| CASE TITLE | Advance Cast Stone vs. Bridge Structural and Reinforcing Iron Workers Union No.1 | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Judgment is entered in favor of Defendant. The court concludes that the JAB enjoyed arbitral jurisdiction over Plaintiff on January 18, 2001. Plaintiff is directed to comply with the JAB's ruling.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | 2 | | |
| ✓ | Notices mailed by judge's staff. | | SEP 30 2002 | | 23 |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 9/30/2002 date mailed notice | | |
| | ETV courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | | |


DOCKETED
SEP 3 0 2002

| | | |
|---|---|---|
| ADVANCE CAST STONE COMPANY. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01 C 2748 |
| | ) | |
| BRIDGE, STRUCTURAL AND | ) | Judge Rebecca R. Pallmeyer |
| REINFORCING IRON WORKERS, LOCAL | ) | |
| UNION NO. 1, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Advance Cast Stone Company challenges the January 18, 2001 award of a Joint Arbitration Board in favor of Defendant Bridge, Structural & Reinforcing Iron Workers, Local Union No. 1 (hereinafter, "Iron Workers"). Plaintiff contends it is not bound by the terms of the Principal Agreement between the Iron Workers and the Associated Steel Erectors of Chicago and that the JAB therefore had no jurisdiction over the dispute between Advance Cast Stone and the Iron Workers. The Iron Workers contend Plaintiff was in fact bound to arbitrate the grievance or is estopped by its conduct from denying that it was obligated to employ Iron Workers for certain work Plaintiff performed in Chicago. Upon the completion of a bench trial, for the reasons stated here, the court enters judgment in favor of Defendant.

## FINDINGS OF FACT

Advance Cast Stone Company ("Advance Cast Stone" or "the Company"), an employer within the meaning of 29 U.S.C. § 152(2), is in the business of manufacturing and installing precast concrete. (Final Pretrial Order, Statement of Uncontested Facts ("Unc. Facts"), ¶ 1; Transcript of Proceedings ("Tr."), at 15-16.) Based in Random Lake, Wisconsin, the Company does the bulk of its business in Wisconsin and Illinois. (Unc. Facts ¶ 2; Tr., at 17.) Matt Garni has been president of the Company for 10 years. (Unc. Facts ¶ 3; Tr., at 15.) For at least 10 years, the



Company has been party to the collective bargaining agreements between Illinois District Council No. 1 of the International Union of Bricklayers and Allied Craftworkers ("Bricklayers") and the Mason Contractors Association of Greater Chicago including, most recently, the agreement in effect between the Bricklayers and the Mason Contractors from June 2000 through May 2004 (the "Bricklayer Agreement"). (Unc. Facts ¶¶ 4-6; Tr., at 20, 153-57; Plaintiff's Consent to Collective Bargaining Agreement of 2/14/00, Plaintiff's Exhibit ("PX") 1; Joint Agreement between Bricklayers and Mason Contractors of 6/1/00, PX 2.)

The Iron Workers, a labor organization within the meaning of 29 U.S.C. § 152(5), bargain with the Associated Steel Erectors of Chicago ("Association"). The Iron Workers have entered into a series of Principal Agreements with that Association; the current agreement is in effect from June 2000 through May 2003. (Unc. Facts ¶¶ 8, 10, 11; Tr., at 198-99, 206-08, 256, 298-99; Joint Agreement between Association and the Iron Workers of 5/31/97 to 5/31/00 ("1997-2000 Joint Agreement"), Joint Exhibit ("JX") 1; Joint Agreement between Association and the Iron Workers of 6/1/00 to 5/31/03, JX 2.) Advance Cast Stone has never been a member of the Steel Erectors Association (Unc. Facts ¶ 9; Tr., at 24-25), but on February 12, 1982 and again on July 23, 1982, the Company entered into compliance agreements by which it agreed to be bound by the Principal Agreement then in effect. (Unc. Facts ¶¶ 9, 13, 14; Tr., at 22; Compliance Agreement between Advance Cast Stone and Iron Workers of 2/12/82 ("2/12/82 Compliance Agreement"), JX 3; Compliance Agreement between Advance Cast Stone and Iron Workers of 7/23/82 ("7/23/82 Compliance Agreement"), JX 4.) Advance Cast Stone considered the Bricklayers more skilled than the Iron Workers at the concrete installations performed by the Company, however, and the Bricklayer Agreement was economically more favorable to the Company with regard to overtime and minimum reporting pay requirements than the Principal Agreement. (Tr., at 23-24, 29, 104-05.) On November 25, 1996, the Company submitted a written notice of termination, and it is undisputed that effective at midnight on May 31, 1997, the Company's compliance agreements

terminated and Advance Cast Stone was no longer bound to the Principal Agreement with the Iron Workers. (Unc. Facts ¶¶ 15, 16; Tr., at 23-24, 74-75, 257; Letter of Termination from Advance Cast Stone to Iron Workers of 11/25/96, JX 5.) The Iron Workers did not respond to the Company's 1997 termination letter or otherwise protest the termination decision. (Tr., at 24.)

Between June 1, 1997 (the day after termination of the compliance agreements) and August of 1998, Advance Cast Stone completed 11 projects within the geographical territory covered by the Iron Workers' Principal Agreement.[1] (Tr., at 26-28; Table of "Advance Cast Stone Projects within the Geographical Territory of Iron Workers, Local No. 1 During the Period of 6/1/97 to 12/31/01" ("Projects Table"), PX 14.) On eight of these projects, the Company used only Bricklayers on its crews; on the other three, it used a single Iron Worker, Bob Hancock, a friend of Mr. Garni and Company foreman Jim Crotty. (Projects Table, Tr., at 28-30.) On all 11 projects, the Company applied the terms and conditions of the Bricklayer Agreement, except that it paid Hancock wages and benefits at the Iron Workers' rate, submitted monthly reporting forms to the Iron Workers, and paid contributions to the Iron Workers pension fund. (Tr., at 29-32; Iron Workers Monthly reporting forms ("IW Monthly Reps.") submitted by Advance Cast Stone for January-July 1998, Defendant's Exhibit ("DX") 1.) The Iron Workers did not protest, walk off, or otherwise put

---

[1] The Principal Agreement defines the Iron Workers' territorial jurisdiction as the area within the following boundaries:
    A.    On the North, the Wisconsin State Line.
    B.    On the Northwest, from County Line on Route 53, follow Cook County Line to McHenry County, West on Kane County Line to Route 31, North on Route 31 to Route 14, Northwest on Route 14 to Route 47, Route 47 to the Wisconsin Line. Territories East of these Routes belong to [the Iron Workers].
    C.    On the West, Illinois Route 53 from Cook County Line along the Eastern City limits of Glen Ellyn; South to 31st Street, then east on 31st Street to the Eastern City limits of Downers Grove; South on Fairview Avenue onto Route 66, then East on 91st Street to Clarendon Hills Road; South on line with Clarendon Road to Cook County Line.
    D.    On the South, and Southwest, Will County Line.
    E.    On the Southeast, Indiana County Line.
(1997-2000 Joint Agreement.)

pressure on the Company with regard to any of the 11 projects. (Tr., at 36.)

At some point in July or August 1998, Advance Cast Stone began working on the Block 120 project, a multi-tenant building located on the corner of Ontario and Rush Streets in Chicago. (Tr., at 32.) The Company alleges that when it arrived at the project with a crew composed exclusively of Bricklayers, some Iron Workers who were working on the project for other subcontractors began walking off the job in protest of the fact that there were no Iron Workers on the Company's crew. (Tr., at 33-35.) Under cross-examination, Garni conceded that Iron Worker Bob Hancock worked for the Company on Block 120 during the week of July 26, more than a week before Advance Cast Stone responded to the alleged job pressure. (Tr., at 93-95.) At any rate, after the general contractor on the project warned that he would charge the Company for any delays caused by other unions walking off the job site, Advance Cast Stone entered into a Short Form Agreement with the Iron Workers on August 6, 1998. (Unc. Facts ¶ 17; Tr., at 35-39, 88-90, 238-39, 262-63; Short Form Agreement between Advance Cast Stone and Iron Workers of 8/5/98, copy signed by Matt Garni, JX 6; Short Form Agreement between Advance Cast Stone and Iron Workers of 8/6/98, copy signed by Iron Workers president and business agent Robert R. Boskovich, JX 7.)[2] The Short Form Agreement provided in part that the Company would pay set amounts to the Iron Workers' trust fund for "health and welfare," "pension," as well as other negotiated benefits for each hour that Iron Workers employees worked under the agreement. (Short Form Agreement.) Mr. Garni amended the Short Form Agreement with a hand-written signed notation dated August 5, 1998, stating "for the project known as Block 120 only." (Short Form Agreement; Tr., at 37, 39.) Unlike the compliance agreements the Company had signed in the past, the Short Form Agreement did not refer to or incorporate the Principal Agreement. (Short Form Agreement; 2/12/82 Compliance

---

[2] The court uses the term "Short Term Agreement" to refer to both of the signed copies of the agreement. On August 5, 1998, Mr. Garni signed and amended a copy of the Short Term Agreement and faxed it to the Iron Workers, whose president, Robert Boskovich, signed the faxed copy the next day.

4

Agreement; 7/23/82 Compliance Agreement.) There is no evidence that the Iron Workers ever sent the Principal Agreement to the Company. Mr. Boskovich testified that the Short Form Agreement was "mostly for out-of-towners who come in for one job" and said that he sent the Short Form agreement to Garni only after Garni assured him that Block 120 was the only job he was going to be working in the Chicago area. (Tr., at 264-265.)

After the execution of the August 6, 1998 Short Form Agreement, Advance Cast Stone applied the Short Form Agreement to the Block 120 project and two other projects commonly known as Cathedral Place and Rush Garage.[3] (Unc. Facts ¶ 19; Tr., at 42-47, 49-50, 121-23, 128, 140-41, 145, 178; 12/8/98 Letter from Garni to Pete Marinopoulos, Business Agent for the Bricklayers, PX 3.) Between August 1998 and June 1999, during the Block 120, Cathedral Place, and Rush Street garage projects, the Company paid wages and fringe benefits to Iron Workers members and filed monthly reports on their hours worked.[4] (Tr., at 140-41, 219-220; Iron Workers Monthly Reps. for August 1998 to July 2000, DX 1; Advance Cast Stone employee hours sheets for weeks ending 7/26/98-8/23/98, DX 17; 9/11/98-9/19/98, DX 18; 10/11/98-10/25/98, DX 19; 11/1/98-11/29/98, DX 20; 12/6/98-12/27/98, DX 21.) During this period, the Company also made contributions to the Iron Workers' pension fund for its Iron Worker employees. (Tr., at 125.)

Significantly, after signing the Short Form Agreement, the Company also sent the Iron Workers documentation of a Wage and Fringe Benefit Bond and of liability insurance coverage. (Tr., at 228-29, 231-32; Iron Workers Wage and Welfare Bond signed by Advance Cast Stone on 8/11/98, DX 7; 8/7/98 CNA Certificate of Liability Insurance policy covering Advance Cast Stone,

---

[3] The Cathedral Place project was on State and Superior streets, across from Holy Name Cathedral and approximately six blocks north of Block 120. (Tr., at 42, 107, 306.) The Rush garage was "literally across the street" from Block 120. (Tr., at 48.)

[4] In May 1999, Advance Cast Stone filed a monthly report stating that its Iron Workers crew members had not worked any hours; accordingly, the Company did not pay Iron Workers members any wages or benefits during that month. (Iron Workers Monthly Reps.)

DX 14; 2/16/99 CNA Certificate of Liability Insurance policy covering Advance Cast Stone, DX 15.) The Company consistently maintained these assets: Advance Cast Stone sent a subsequent Certificate of Insurance to Iron Workers on or about November 4, 1999 and did not cancel the wage and fringe bond until February 12, 2001. (Tr., at 131; 11/4/99 CNA Insurance Certificate of Advance Cast Stone's Insurance Coverage, DX 5; Heritage Mutual Insurance Company Notice of Bond Cancellation form on behalf of Advance Cast Stone for benefit of Iron Workers, of 2/12/01, DX 13.) In addition, between November 1998 and an unspecified date in 1999, Advance Cast Stone complied with an audit "as provided for in the Agreement between the Association and the Iron Workers."[5] (Tr., at 169-172; 11/16/98 Letter from Roseann Andersen, Administration Manager for Iron Workers' accountants, to Advance Cast Stone ("Audit Planning Letter"), DX 24; 7/9/99 Fax from Advance Cast Stone employee Mary Jane Depies to Iron Worker accountant Gary Gebis ("Audit Fax"), DX 22; 9/3/99 Letter re Audit from Iron Workers Administrator Steve M. Bukovac to Advance Cast Stone ("Audit Completion Letter"), DX 23.) During the period between July 1999 and July 2000, the Company also continued to submit monthly reporting forms to the Iron Workers, even though the Company did not employ any Iron Workers during this time.[6] (Tr., at 129-131; IW Monthly Reps.) The court notes that the Short Form Agreement does not impose any requirements concerning posting of a wage and benefit bond, certification of liability insurance, or compliance

---

[5] The audit was completed in September 1999. (Audit Completion Letter.) The documents presented by the parties indicate that accountants were scheduled to visit Advance Cast Stone's office on December 8, 1998 to inspect the Company's payroll records for all employees including, but not limited to, Iron Workers, for the period from January 1, 1996 to the date of the audit. (Audit Planning Letter.)

[6] The reporting forms submitted that Advance Cast Stone submitted to the Iron Workers every month between August 1998 and July 2000 provide as follows:
> The undersigned employer (a) certifies that the information contained in this report is true; (b) agrees to recognize and abide by the Trust Agreement under which the Fund Disbursement Office is administered; (c) agrees to make all contributions as provided in the collective bargaining agreements between [the Association] and [the Iron Workers].

(IW Monthly Reps.)

with union audits. (Short Form Agreement.)

On or about November 9, 1998, Advance Cast Stone filed an unfair labor charge against the Iron Workers with the NLRB, alleging that the Iron Workers had unlawfully attempted to "force or require [Advance Cast Stone] to assign particular work to the [Iron Workers] rather than to [the Bricklayers]" on the Cathedral Place project. (Tr., at 116-119; Letter from Advance Cast Stone attorney Robert P. Casey to Boskovich of 11/9/98 and enclosed NLRB charge, DX 2.) The Company offers Mr. Garni's hearsay testimony that it suffered vandalism to its Cathedral Place project equipment until it began to include Iron Workers in its work crews. (Tr., at 46-47, 116-119.) Mr. Boskovich testified that during this work dispute, he told Garni that the Company would have to enter into a Compliance Agreement if it continued to assign work within the jurisdictional area of the Iron Workers. (Tr., at 265.) At an unspecified date in November 1998, Garni, Boskovich, and Bricklayers president Pete Marinopoulos spoke to each other on a conference call. (Tr., at 44-46, 273-275.) During the course of this call, Mr. Garni agreed to use "composite crews" made up of both Iron Workers and Bricklayers on the Cathedral Place project. (Tr., at 42-47.) Upon resolution of the Cathedral Place dispute, Advance Cast Stone withdrew the unfair labor charge filed in connection with the project. (Letter from Casey to NLRB of 11/12/98, DX 4.) On December 8, 1998, Garni sent Marinopoulos a letter summarizing the conference call with Boskovich, agreeing that Advance Cast Stone would "put . . . two iron workers to our three bricklayers" on crews, and stating that "it is understood by the participants of [the] conference call that this is not intended to set a precedence [sic] and is being done Only [sic] for the good of the project and at the recommendation of Local 21. " (Letter from Garni to Marinopoulos re: Cathedral Place, PX 3.) Garni did not send a copy of the letter to Boskovich or the Iron Workers. (Tr., at 46-47.)

On June 25, 1999, Garni sent a letter to the Iron Workers stating that "Advance Cast Stone is not signatory to the Iron Workers' ['Principal Agreement]," noting that the Short Form Agreement "signed for the Block 120 project and subsequently utilized for two other projects, does not

incorporate the [Principal Agreement] within it and is no longer in effect due to all three projects having been completed," and concluding that "there is no binding agreement between Advance Cast Stone and [the Iron Workers]." (Tr., at 50-51; Letter from Garni to the Iron Workers of 6/25/99 ("Garni Union Letter"), PX 4.)[7] The Iron Workers argue that they never received this letter, and they did not respond to it. (Tr., at 50-51, 296-97, 310.) On June 26, 1999, Garni sent a letter to the Iron Workers' pension fund, Mid-America Pension Fund, explaining that the Company had terminated its agreement with the Iron Workers on May 31, 1997, and declining to pay $3,166.54 that the fund claimed was owed to Iron Workers. (Tr., at 51; Garni Letter to David Jansen of Mid America Pension Fund of 7/26/99, PX 5.) There is no evidence that the Iron Workers made any response to this letter, and Garni did not recall receiving one. (Tr., at 51.)

Between August 1998 and the end of 1999, Advance Cast Stone worked on 13 projects within the Iron Workers' geographical territory, including the three that were covered by the Short Form Agreements. (Projects Table.) On nine of the remaining ten projects, the Company used crews composed entirely of Bricklayers without any protest from the Iron Workers. (Projects Table; Tr., at 52.) On the remaining project in September 1998 at the College of Lake County, the Company used Bob Hancock and another Iron Worker. (Projects Table, Tr., at 39-40.)

In 2000, Advance Cast Stone worked on eight projects within the geographical territory covered by the Iron Workers' Principal Agreement. (Projects Table.) The Company did not use Iron Workers on any of these projects. (Id.) The Company used all-Bricklayer crews on all of these jobs except one. (Projects Table; Tr., at 51-52.)

At some point during August or September 2000, Advance Cast Stone began working with

---

[7] Plaintiff's exhibit includes two certified mail receipts: one indicating that the letter was sent to the Iron Workers office in Forest Park, Illinois on June 25, 1999, and the other signed by an Iron Workers agent on June 28, 1999. (Garni Union Letter.) The court can not determine the name of the person who signed the second receipt. (Id.)

8

an all-Bricklayer crew on the new Goodman Theatre.[8] (Projects Table; Tr., at 52-54.) The Iron Workers argued that the work Advance Cast Stone was performing was covered under the Principal Agreement, but Advance Cast Stone refused to employ Iron Workers members on the project. Shortly after Advance Cast Stone began working, the Iron Workers threatened to picket the project. (Tr., at 53.) Advance Cast Stone then filed an unfair labor practice charge with the NLRB, contending that the threat to picket was unlawful. (Tr., at 53.)[9] At an unspecified date, the Iron Workers contacted the NLRB and disclaimed interest in the Goodman project, rendering Advance Cast Stone's charge moot. (Id.)

On or about November 21, 2000, the Iron Workers submitted a Grievance Dispute/Demand for arbitration to a Joint Arbitration Board ("JAB"), alleging that (1) Advance Cast Stone's actions had bound it under the Iron Workers' Principal Agreement and (2) Advance Cast Stone had violated the Principal Agreement by refusing to employ members of the Iron Workers on the Goodman Theatre project. (Unc. Facts ¶ 20; Tr., at 54, 137-40, 224-25, 287-88; Grievance Dispute/Demand for Arbitration Adjudication submitted by Iron Workers to JAB on 11/21/00, JX 8.) On January 18, 2001, the JAB held a hearing on the grievance. (Unc. Facts ¶ 21; Tr., at 54, 142-45, 288, 311; Minutes of Grievance Meeting on 1/18/01 prepared by JAB chairman Patrick Clark ("Meeting Minutes"), JX 9.) Matt Garni appeared at the hearing telephonically, along with Edward C. Jepson, Jr., one of Advance Cast Stone's lawyers. (Unc. Facts ¶ 22; Tr., at 55, 141-42, 289; Meeting Minutes.) At the outset of the hearing, Mr. Jepson stated that he and Mr. Garni were making a special appearance because the JAB did not have jurisdiction over Advance Cast Stone. (Unc. Facts. ¶ 23; Tr., at 55-56, 142; Meeting Minutes.) During the hearing, the Company argued

---

[8]    The Goodman Theatre is located at the corner of Randolph and Dearborn Streets in downtown Chicago.

[9]    Because the parties have not submitted the Company's NLRB charge, the court has relied on Plaintiff's summary thereof.

that it did not have a contract with the Iron Workers, but did not discuss its June 1999 letter with the Board or present a copy to them. (Tr., at 142.) Despite the Company's objections, the JAB continued with the hearing (Unc. Facts ¶ 24; Tr., at 56; Meeting Minutes), during which Garni provided testimony in opposition to the Iron Workers and asserted that Advance Cast Stone was not bound to a collective bargaining agreement with the Iron Workers. (Meeting Minutes.)

Later the same day, the JAB issued a decision in which it found that Advance Cast Stone had been bound to the Principal Agreement since signing the Short Form Agreement on August 6, 1998, and had violated the terms of the Principal Agreement. (Unc. Facts ¶ 25; Tr., at 56, 146-48, 289; JAB Arbitration Decision/Award, JX 10.) The JAB ordered Advance Cast Stone to submit to a payroll audit pursuant to the terms of the Principal Agreement, and to pay all wages, fringe and other benefits due for any work that should have been assigned to Iron Workers members since August 6, 1998. (JAB Arbitration Decision/Award.)

On April 18, 2001, Advance Cast Stone timely filed suit in this court to vacate the JAB's award. (Unc. Facts ¶ 26.)

## DISCUSSION

The central question in this case is whether Advance Cast Stone was bound to the Principal Agreement at any time after August 6, 1998. It is well settled law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Tech., Inc. v. Communication Workers*, 475 U.S. 643, 648 (1986) (citations omitted); *Penn v. Ryan's Family Steakhouses, Inc.*, 269 F.3d 753, 758 (7th Cir. 2001). "[A] collective bargaining agreement is not an ordinary contract," *John Wiley & Sons v. Livingston*, 376 U.S. 543, 550 (1964), however, and "[o]rdinary common law contract principles, therefore, cannot simply be imported whole into the labor context and mechanistically applied to collective bargaining agreements." *Merk v. Jewel Food Stores*, 945 F.2d 889, 892 (7th Cir. 1991). Congress

10

has accorded labor contracts a special status, and authorized the courts to fashion a body of federal law governing their enforcement. *Id.*; *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456 (1957).

It is well-settled law that "a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound." *Gariup v. Birchler Ceiling & Interior Co., Inc.*, 777 F.2d 370, 373 (7th Cir. 1985), *quoting Capital-Husting Co., Inc. v. NLRB*, 671 F.2d 237, 243 (7th Cir. 1982). An employer may adopt a collective bargaining agreement by its actions or by a course of conduct that demonstrates an intent to abide and be bound by the terms of such an agreement. *U.S. Can Company v. NLRB*, 984 F.2d 864, 870 (7th Cir. 1993); *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988); *Gariup*, 777 F.2d at 373 (7th Cir. 1985). At issue is the employer's objective conduct; its subjective intentions are immaterial unless manifested through conduct. *See Robbins*, 836 F.2d 332; *Chicago Tile Inst. Welfare Fund v. Picha Tile Corp.*, No. 93 C 4473, 1995 WL 584231, at *4 (N.D. Ill. Oct. 3, 1995).

The only agreement that the Company signed with the Iron Workers during the period in question was a Short Form Agreement that neither referred to nor incorporated the Principal Agreement. Because it is undisputed that in 1997 the Company terminated the only written agreement that ever bound it to the Principal Agreement, the court must determine whether the Company's course of conduct in dealing with the Iron Workers objectively indicated a desire to be bound by the Principal Agreement.

After careful consideration of the exhibits and testimony in this case, the court concludes that Advance Cast Stone did bind itself to the Principal Agreement through its course of conduct. There is ample evidence suggesting that the Company went well beyond the terms of the Short Form Agreement that it now holds up as its only binding contract with the Iron Workers. Notably, Advance Cast Stone continued to submit monthly work reports on Iron Workers employees for a full 12 months after it last employed an Iron Worker. The form that the Company filled out each

month specifically provided that it was agreeing "to make all contributions as provided in the collective bargaining agreements between the Iron Workers and their Association." *See Moriarty v. Larry G. Lewis Funeral Dirs. Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998) ("general principles of contract law permit an employer to adopt a collective bargaining agreement by a course of conduct plus a writing such as the certification line on the contribution report; a signature at the bottom of the collective bargaining agreement itself is unnecessary"); *Chicago Tile Inst. Welfare Fund v. Picha Tile Corp.*, No. 1993 C 4473, 1995 WL 584231, at *5 (N.D. Ill. October 3, 1995) (employer's ongoing submission of monthly report forms with language referring to union's collective bargaining agreement evidenced employer's acceptance of agreement); *Laborers' Pension Fund v. E. Guerra Co.*, No. 99 C 4085, 2000 WL 1349148, at *4 (N.D. Ill. Sept. 14, 2000) (same).

Also relevant is the Company's consent to an Iron Workers audit that was not referred to on the Short Form Agreement. *Chicago Dist. Council of Carpenters Pension Fund v. R. J. Ward Constr., Inc.*, No. 93 C 980, 1993 WL 535323, at *4 (N.D. Ill. Dec. 16, 1993) (court deemed it "highly unlikely" that corporation would have submitted to audit if it believed its obligations under collective bargaining agreement had terminated). Moreover, it is undisputed that the Company satisfied a wage and welfare bond requirement imposed by the Principal Agreement and not mentioned in the Short Form Agreement. As noted above, the Company did not cancel the bond until February 2001, more than a year and a half after it last hired Iron Workers, further strengthening the inference that the Company intentionally complied with the Principal Agreement. *See Chicago Dist. Council of Carpenters Pension Fund*, 1993 WL 535323, at **4-5. Finally, Advance Cast Stone went beyond the Short Form Agreement in providing the Iron Workers with certificates evidencing the Company's insurance coverage.

Not all of the evidence supports the Iron Workers' case. The Company notes that in June 1999, it sent letters to both the Iron Workers and their pension fund, specifically stating that

Advance Cast Stone was not bound by the Principal Agreement.[10] The Company argues that it never received a copy of the Principal Agreement and that it sent a letter to the Bricklayers expressing its understanding that its use of composite crews on three projects in 1998 and 1999 was not intended to create a precedent. Finally, the Company notes that the NLRB grievances it filed against the Iron Workers, as well as the Iron Workers' failure to protest a number of Company projects with all-Bricklayer crews within the Iron Workers' jurisdiction, show that the parties did not believe the Company was bound to the Principal Agreement.

On balance, however, the court finds itself unpersuaded by the Company's evidence. Some of it is not relevant to the core issue of whether or not the Company's objective conduct bound it to the Principal Agreement. Thus, in sending a letter to Marinopoulos but not the Iron Workers, the Company did not provide a public, objective repudiation of the Principal Agreement. If anything, writing a letter that putatively summarized a conversation with Boskovich and then failing to send the Iron Workers a copy might create an inference that the Company was *reluctant* to publicly disavow the Principal Agreement. Similarly, the fact that the Company worked on a number of projects in the Iron Workers' jurisdiction without hiring Iron Workers or enduring picketing does little to clarify the Company's contractual status, either.[11] Because these projects are the very conduct that the Iron Workers considers to have been contractual breaches, the court can not give them much weight as evidence that a contract did not exist. Similarly, the fact that Advance Cast Stone may not have been sent a copy of the Principal Agreement apparently did not keep it from engaging in conduct that was required by the Principal Agreement and not mentioned in the Short Form Agreement. As a party formerly in compliance with the Principal Agreement, and as one that

---

[10] The Iron Workers deny ever receiving the Company's letter, but the court will assume that the letter–sent as it was by certified mail–was received.

[11] Advance Cast Stone has also failed to reconcile its repeated use of Iron Worker Bob Hancock on projects before and after the signing of the Short Term Agreement with its avowed preferences for Bricklayers and for not being bound by the Principal Agreement.

13

quickly began to observe various provisions under the Principal Agreement, the Company may not have appeared to need a copy of the document.

Advance Cast Stone's strongest evidence is the letters it sent to the Iron Workers and their pension fund and the action it took against the Iron Workers with the NLRB. This evidence all suggests that the Company was making an effort to inform the Iron Workers of its desire not to be bound by the Principal Agreement.[12] In the court's view, however, under the Company's own version of the facts, its behavior was strikingly inconsistent. Thus, Advance Cast Stone sent the letters that make up its strongest evidence in June 1999, but sent faxes in compliance with the Iron Workers' audit the very next month. The Company renewed its insurance certification in September 1999, continued sending monthly report forms to the Iron Workers until July 2000, and failed to cancel its bond until February 2001. In sum, after taking on obligations beyond the parameters of the Short Form Agreement but within the Principal Agreement, the Company both rejected the Principal Agreement and continued to perform under it. The court concludes that Advance Cast Stone's course of conduct bound it to the Principal Agreement, and therefore rendered it susceptible to the jurisdiction of the JAB on January 18, 2001.[13]

---

[12] As Defendant notes in its post-trial brief, it is possible to read Plaintiff's June 25, 1999 letter as an effort to terminate the Principal Agreement. Under that interpretation, Plaintiff would have conceded being bound under the Principal Agreement from August 6, 1998 until the expiration of that agreement on May 31, 2000. Unlike Plaintiff's 1997 letter of termination, the June 25, 1997 letter does not mention termination, however, and Plaintiff has not raised the issue of termination before either the JAB or this court. Accordingly, the court will assume that termination is not an issue in this case. The court notes further that under the 1997-2000 Principal Agreement, in the absence of a written notice of termination,"the [Principal Agreement] shall continue in effect for an additional year" after its expiration date, and "shall remain in effect from year to year thereafter" until a party gives notice of termination. (1997-2000 Joint Agreement.)

[13] In light of its disposition of this case, the court need not address Defendant's breach of contract and promissory estoppel claims.

14

## CONCLUSION

Judgment is entered in favor of Defendant. The court concludes that the JAB enjoyed arbitral jurisdiction over Plaintiff on January 18, 2001. Plaintiff is directed to comply with the JAB's ruling.

ENTER:

Dated: September 30, 2002

REBECCA R. PALLMEYER
United States District Judge